IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SCOTTSDALE INSURANCE COMPANY, | CV 23–48–M–DWM |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| WILD HORSE TRADING CO., LLC, RYAN HART, STEVEN BLANCHARD, ROXANNE BLANCHARD, and JASON SUBATCH, | |
| Defendants. | |

In this insurance declaratory judgment action, the parties dispute coverage

for injuries resulting from a 7,000-pound bundle of wood poles falling on Steven

Blanchard.  Scottsdale Insurance Company, the Plaintiff, argues that there is no

coverage or duty to defend its insured, Wild Horse Trading Co., LLC ("Wild

Horse"), in the underlying action because coverage is excluded under an Injury to

Workers exclusion and because Wild Horse made material misrepresentations

about the nature of its business in procuring its Scottsdale policy.  Because these

arguments are unpersuasive, Scottsdale has a duty to defend and to indemnify if

liability is found in the underlying action.

Page 1 of 22

**BACKGROUND**[1]

## I.     The Underlying Action

On August 12, 2022, Blanchard was picking up a load of pole bundles for Pacific Western Lumber ("PacWest") at the Clark Fork Posts facility in Plains, Montana, when a 7,000-pound bundle of wood poles fell on him due to Ryan Hart's allegedly negligent operation of a loader belonging to Wild Horse.  (Doc. 44-2 at ¶¶ 16–39.)  On January 13, 2023, Blanchard and his wife filed suit in state court against several individuals and entities based on the incident.  (Doc. 39 at ¶ 15.)  Ultimately, the Blanchards pursued ten claims against Wild Horse and Hart, as well as Jason Subatch (one of the two members of Wild Horse), PacWest, Nautilis Insurance Company, and Scottsdale Insurance Company (the "Underlying Action" or the "Underlying Complaint").  (*See* Doc. 39 at ¶¶ 16–18 (summarizing procedural history); Doc. 44-2 (Second Am. Compl.).)  Scottsdale issued reservation of rights letters to Wild Horse, Hart, and Subatch, agreeing to defend them under a complete reservation of rights.  (*See* Docs. 44-3, 44-4, 44-5, 44-6, 44-7, 44-8.)

## II.     The Policies

Wild Horse first obtained Commercial General Liability coverage from Scottsdale on October 16, 2019, policy number CPS3306488 (the "Initial Policy").

---

[1] All facts are undisputed unless otherwise indicated.  (Docs. 48, 54, 62, 70.)

(Doc. 60-2 at 2.)  Scottsdale renewed Wild Horse's policy on October 19, 2020, policy number CPS3306488, (the "First Renewed Policy").[2]  (Doc. 60-3 at 3.)  On October 19, 2021, Scottsdale again renewed Wild Horse's insurance policy, policy number CPS7465262, (the "Second Renewed Policy" or the "Policy").  (Doc. 44-1 at 7.)   The Second Renewed Policy is the policy at issue here.

## III.   The Present Action

On  May 10, 2023, Scottsdale filed the present coverage action in this Court, seeking a declaratory judgment that it has no duty to defend or indemnify Wild Horse, Subatch, or Hart in the underlying action (collectively with the Blanchards, "Defendants").  (*See* Docs. 1, 39.)  The parties have filed cross-motions for summary judgment.  (*See* Docs. 46, 52.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1137 (9th Cir. 2001) (standard for cross-motions).  Because this Court is sitting in diversity, Montana's substantive law on contract interpretation applies.  *See Ticknor v. Choice Hotels Int'l Inc.,* 265

---

[2] Despite the three-day lapse in coverage, the parties agree that the First Renewed Policy was considered a renewal.  (*See* Doc. 62 at ¶ 9.)

F.3d 931, 937 (9th Cir. 2001).  "In Montana, the interpretation of an insurance contract is a question of law."  *Barnard Pipeline, Inc. v. Travelers Prop. Cas. Co. of Am.*, 3 F. Supp. 3d 865, 870 (D. Mont. 2014).

The duty to defend "is independent from and broader than the duty to indemnify created by the same insurance contract."  *Tidyman's Mgm't Servs. Inc. v. Davis*, 330 P.3d 1139, 1149 (Mont. 2014) (internal quotation marks omitted). "An insurer must defend unless there exists an unequivocal demonstration that the claim against the insured does not fall under the policy's coverage."  *Emplrs. Mut. Cas. Co. v. Estate of Buckles*, 443 P.3d 534, 538 (Mont. 2019) (internal quotation marks omitted).  The "threshold question" is therefore "whether the complaint against the insured alleges facts that, if proven, would trigger policy coverage." *Tidyman's*, 330 P.3d at 1150.  "When a court compares allegations of liability advanced in a complaint with policy language to determine whether the insurer's obligation to defend was 'triggered,' a court must liberally construe allegations in a complaint so that all doubts about the meaning of the allegations are resolved in favor of finding that the obligation to defend was activated."  *Farmers Union Mut. Ins. Co. v. Staples*, 90 P.3d 381, 385 (Mont. 2004).  An insurer that refuses to tender a defense based on coverage does so "at its peril" because if its failure is unjustified and liability is found, "the insurer is estopped from denying coverage and becomes liable for defense costs and judgments."  *Tidyman's*, 330 P.3d at

1149; *Draggin' Y Cattle Co., Inc. v. Junkermier, Clark, Campanella, Stevens, P.C.*, 439 P.3d 935, 941 (Mont. 2019).

ANALYSIS

Defendants argue that the Policy covers the injuries alleged in the Underlying Action. Scottsdale counters that there is no coverage based on the Injury to Employee and Worker Exclusion ("Injury to Worker Exclusion") and because Wild Horse made material misrepresentations to Scottsdale that obscured some of the business's risk. Scottsdale is wrong on both accounts.

## I. General Liability Coverage

Defendants argue, and Scottsdale does not substantively dispute, that barring any exclusions or exceptions, the Policy covers the Blanchards' injuries. The Policy's General Liability Coverage provides coverage for "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . caused by an 'occurrence' that takes place in the 'coverage territory.'" (Doc. 44-1 at 25.) Defendants have demonstrated that, barring exclusions, each of these elements have been met in the Underlying Action. First, Wild Horse, Subatch, and Hart are all "insureds" under the Policy. Wild Horse is the Insured listed on the Policy itself. (*See* Doc. 44-1 at 9.) Subatch is an Insured as he is a member (insured "only with respect to the conduct of [the] business") and manager (insured "only with respect to the [his] dut[y] as [a] manager[]") of Wild Horse. (*See* Docs. 44-1

at 33; Doc. 44-2 at ¶¶ 58–77.)  Hart is an Insured because he was employed by

Wild Horse at the time of the accident.  (*See* Doc. 44-7 at 16.)  Second, Blanchard

sustained "bodily injury" under the plain language of the Policy.  Defendants argue

that Blanchard's wife's damages are "because of" Blanchard's bodily injury and

Scottsdale does not dispute this in their briefing.  Third, an "occurrence" in the

"coverage territory" was alleged in the Underlying Action under the plain language

of the Policy.  Thus, barring policy exclusions and defenses under Montana law,

there is coverage and Scottsdale has a duty to defend.

## II.    Injury to Worker Exclusion[3]

Scottsdale first argues the Injury to Worker Exclusion "plainly and

unambiguously" precludes coverage.  Defendants disagree and argue that notice

provisions of Montana law prevent the exclusion from being applied here.

Defendants are correct.

### A.    Part B

Part B of the Injury to Worker exclusion provides, in pertinent part, that the

Policy's Commercial General Liability Coverage does not apply to "bodily injury"

to (a) any contractor or subcontractor "hired or retained by or for any insured" or

---

[3] The "Limitation of Coverage to Designated Premises, Project or Operation Endorsement" is not relied upon in Scottsdale's summary judgment briefing.  More importantly, in its statement of disputed facts, Scottsdale asserts it does "not seek a declaration regarding the Limitation of Coverage to Designated Premises, Project or Operation Endorsement as part of this litigation."  (Doc. 62 at ¶ 29.)

(b) to "[a]ny employee or anyone directly or indirectly employed by such

contractor [or] subcontractor."  (Doc. 44-1 at 63.)  Put simply, the plain language

of Part B precludes coverage to anyone down the chain-of-command of anyone

hired by the insured.  Scottsdale argues that Part B precludes coverage because

Blanchard's injuries arose out of his retention by PacWest, while Defendants argue

that Part B does not apply because Blanchard was not hired by Wild Horse.

Blanchard was hired as a subcontractor by PacWest to transport posts from

Clark Fort Posts' facility in Plains, Montana.  (Doc. 22 at ¶¶ 12–13.)  In turn, Clark

Fork Posts hired Wild Horse to move posts around the Plains facility.  (*Id.* ¶ 12.)

So, as alleged in the Underlying Action, Wild Horse was a subcontractor for Clark

Fork Posts and Blanchard was a subcontractor for PacWest.  There is no contract

between Wild Horse—or any other insured—and Blanchard.  Thus, Part B does

not preclude coverage under the Policy.

### B.    Part C

Scottsdale next argues that Part C of the Injury to Worker Exclusion

precludes coverage because Blanchard is a "worker."  Defendants agree that if Part

C applies, it precludes coverage.  They argue, however, that Part C is unenforceable

because Scottsdale failed to notify Wild Horse of the change to the Policy.  Because

Defendants are correct as to the former, the exclusion cannot be applied here.

#### 1.    Coverage Preclusion

Part C of the Injury to Worker Exclusion provides there is no coverage under the Policy's Commercial General Liability Coverage for "bodily injury" to any "worker." (Doc. 44-1 at 64.) The exclusion defines a "worker" as "any person performing duties directly or indirectly related to the conduct of any business, regardless of the person or organization responsible for hiring, retaining, employing, furnishing or directing the worker." (*Id.*)

The Underlying Action alleges that Blanchard was performing duties directly related to the conduct of his own business and/or he was indirectly performing duties related to the conduct of Clark Fork Posts' and PacWest's businesses. (*See* Doc. 44-2 at ¶¶ 25–28.) The Underlying Complaint further alleges that Clark Fork Posts hired Wild Horse to "undertake work on its behalf . . . for the purpose of loading . . . pole bundles." (*Id.* ¶ 30.) Clark Fork Posts' and PacWest's business interests were to get the pole bundles from the facility in Plains to another facility, and they hired Blanchard to do that work. (*Id.* ¶¶ 25–31.) Blanchard's work for Clark Fork Posts and PacWest was therefore directly related to Wild Horse's business, as Clark Fork Posts had hired Wild Horse. As the exclusion lays out, it is immaterial that Wild Horse was not "responsible for hiring" Blanchard. Therefore, if Part C is enforceable, it precludes coverage.

## 2. Enforceability

The next question, then, is whether Scottsdale complied with Montana law

when it added the Injury to Worker Exclusion to the Policy. "If an insurer offers or purports to renew a policy but on less favorable terms, at a higher rate, or at a higher rating plan," the insurer must notify the insured of the change. Mont. Code Ann. § 33–15–1106. These changes may not "take effect" unless "the insurer has mailed or delivered notice of the new terms, rate, or rating plan to the insured at least 45 days before the expiration date." *Id.* "Whether an insurer has provided adequate notice of a change in insurance coverage requires a two-step analysis." *Robertus v. Farmers Union Mut. Ins. Co.*, 189 P.3d 582, 587 (Mont. 2008) ("*Robertus* Test"). First, a court "must determine whether the policy modification constituted a change in coverage requiring notice" under the statute. *Id.* Second, a court "must determine whether the insurer provided adequate notice of the change in coverage." *Id.* The insurer has the burden to demonstrate proper notice. *Thomas v. Nw. Nat'l Ins. Co.*, 973 P.3d 804, 808 (1998). However, the notice requirement "does not apply if the increase in the rate or the rating plan, or both, results from a classification change based on the altered nature or extent of the risk insured against." § 33–15–1106(2).

Here, Scottsdale argues that notice was not required because it made a "classification change based on the altered nature or extent of the risk insured against" as outlined in § 33–15–1106(2), and that even if notice was required, it was properly provided. Defendants argue that although a new classification was

added, that does not absolve Scottsdale of its responsibility to notify Wild Horse of less favorable terms in a renewed policy.  Defendants have the better argument.

First, the change in the Policy required notice under § 33–15–1106, satisfying the first prong of the *Robertus* test.  Although both the First Renewed Policy and the Second Renewed Policy included Injury to Worker exclusions, the language is different in the most recent exclusion.  The First Renewed Policy's Injury to Worker Exclusion only precluded coverage for a contractor or subcontractor of the insured.  (Doc. 60-3 at 50.)  In the Second Renewed Policy, Scottsdale changed the definition of "worker" to preclude coverage to a much larger group of people, as discussed above.  (*See* Doc. 44-1 at 63.)  The gravity of the difference is only all too clear under the facts of this case.  Blanchard was not a contractor or subcontractor of the insured.  Accordingly, he likely would not have fallen under the old exclusion; but he is excluded under the new policy language for the reasons explained above.  Thus, the new exclusion changes the Policy to include "less favorable terms" because fewer occurrences are covered.

Nevertheless, notice may not be required under the plain language of § 33–15–1106(2) because the Policy also contained a new classification.  On September 3, 2021, before the second policy renewal occurred, Scottsdale sent an insurance quote and proposal for the policy (the "Quote") via Big Sky Underwriters, to insurance producer Tiffani Sheehan.  (*See* Docs. 51-1, 51-2.)  Sheehan received a

10% commission from Scottsdale for facilitating the transaction.  (Doc. 51-1 at 1.)

In addition to renewing the First Renewed Policy, Scottsdale added an additional

classification for what it considered to be a new risk.  (*Compare* Doc. 44-1 at 24

(Second Renewed Policy class descriptions) *with* Doc. 60-3 at 21 (First Renewed

Policy class descriptions).)  Scottsdale maintains notice was not required under

§ 33–15–1106(2) as the rate change "result[ed] from a classification change."

§ 33–15–1106(2).  To apply, however, the classification change must be "based on

the altered nature or extent of the risk insured against."  *Id.*  Thus, a classification

change negates an insurer's notice requirement, but only if the reason for the rate

increase was the classification change in the insurance policy.

Here, it is undisputed that a new classification was added to the Policy.  The

Building or Premises—Bank or Office—Mercantile or Manufacturing—Other than

Not-For-Profit (Lessor's Risk Only) (Class Code 61212) was added to the Second

Renewed Policy.  (*Compare* Doc. 60-3 at 21 *with* Doc. 44-1 at 24.)  However,

Scottsdale has not demonstrated that the increased rate "result[ed] from" that added

classification.  In its response brief, Scottsdale points to an email conversation

between Tiffani Sheehan and Kriss Martensen, an Associate Underwriter at Big

Sky Underwriters, to support its argument that this classification addition was the

reason for the increase in the cost of the insurance policy.  (*See* Doc. 61 at 10

(citing Doc. 48 at ¶ 3 (citing Doc. 51-2 at 3)).)  The email conversation, which

memorializes a casual communication between two insurance professionals familiar with the facts underlying the policy's needs, may do that. However, that determination reads facts into the record. The conversation merely demonstrates that Martensen noticed there "were some exposures that we are not rated for" and suggested covering for an additional risk. (Doc. 51-2 at 3.) While this does show that new classifications were likely needed, it does not show that this was in fact the reason for the rate increase, especially when other changes were also made the Policy. Therefore, Scottsdale was required to provide notice of the Policy changes.

Because notice is required, it must be done properly. *See Robertus*, 189 P.3d at 587–88. It was not. Scottsdale insists that it notified Wild Horse's agent, Tiffani Sheehan, of the changes to the Policy 45 days before the renewal date and Wild Horse did not object. Defendants counter that notice to Sheehan does not count as notice to Wild Horse because Sheehan is not their agent and that the notice that Wild Horse did receive was deficient. They are correct.

Although Scottsdale notified Wild Horse of some changes in the Second Renewed Policy, it failed to notify Wild Horse that the new Injury to Worker Exclusion covered fewer injuries than the exclusion in the First Renewed Policy.[4]

---

[4] As an initial matter, even if notice to Sheehan was proper, it cannot satisfy notice requirements under Montana law. Sheehan is the insurance producer, contracted by Scottsdale to produce the insurance for Wild Horse's use. (*See* Doc. 51-1 at 1.) Showing that Sheehan was notified does not also show that Wild Horse received proper statutory notice.

(*See* Docs. 51-1; 60-6 at 2.)  Scottsdale sent a Premium Increase/Altered Terms document to Wild Horse on September 3, 2021, which notified the insured "that the rate will be increased and/or the policy coverage will be changed as follows." (Doc. 60-6 at 2.)  Under "change description," that document lists a series of added forms but does not mention the Injury to Worker Exclusion.  (*Id.*)  Nor does Scottsdale mention that change in the Quote sent to Tiffani Sheehan on the same day.  (*See* Doc. 51-1.)  Therefore, Scottsdale failed to provide proper notice of the updated Injury to Worker Exclusion.  Because notice was required and not properly provided, the Injury to Worker Exclusion did not become a part of the Second Renewed Policy and cannot be enforced against Wild Horse under Montana law.  *See Robertus*, 189 P.3d at 587–88.

## III.   Misrepresentation

Next, Scottsdale's argues that Wild Horse materially misrepresented information about its business in negotiating for insurance coverage, causing the insurer to provide coverage for risks it did not know existed.  Under Montana law, Scottsdale argues, these alleged misrepresentations preclude coverage.  Defendants argue that Wild Horse made no misrepresentations to Scottsdale, and even if it truthfully represented information to the insurer that later became inaccurate, those representations were not material to the coverage provided.  Defendants again have the better argument.

## A.    Montana Code Annotated § 33–15–403

The parties agree that Montana Code Annotated § 33–15–403, which defines representations in an insurance contract application, resolves this dispute. However, they disagree as to its proper application here.  Under § 33–15–403(1), "[a]ll statements and descriptions in any application for an insurance policy . . . or in negotiations for an insurance policy . . . by or on behalf of the insured . . . are considered representations."  The statute further states:

> Misrepresentations, omissions, concealment of facts, and incorrect statements preclude a benefit and allow rescission under the policy or contract if:
>
> (a) the representations are fraudulent;
>
> (b) the representations are material either to the acceptance of the risk or to the hazard assumed by the insurer; or
>
> (c) the insurer in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the same premium or rate or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise; and
>
> (d) the questions in the application are sufficiently specific so that a reasonable person would understand the requirement to provide the particular facts and that the applicant's response was material to the insurer's decision to provide coverage or to determine the premium or rate to be charged for the coverage.

§ 33–15–403(2).[5]  "[T]his statute should be read in the disjunctive.  Thus, a

misrepresentation, omission, concealment of fact or incorrect statement will

prevent recovery under an insurance policy if one of the three factors listed in

subsection (2) is present."  *Schneider v. Minnesota Mut. Life Ins. Co.*, 806 P.2d

1032, 1035 (Mont. 1991).  Fraud is not required.  *Id*.

    Parsing out the parties' arguments here requires a closer look at Wild

Horse's representations.  In its reservation of rights letter to Subatch, Scottsdale

argues that Wild Horse misrepresented its employee count and payroll data, as well

as the specifics of its business operations.[6]  (Doc. 44-5 at 19.)  These alleged

misrepresentations are discussed in turn below.

### 1.    Employee and Payroll Data

    In the Applicant Information Section of its insurance application dated

October 2, 2019, Wild Horse listed Subatch as the owner of the company.  (*See*

Doc. 51-3 at 2.)  There is no indication that Wild Horse had any other employees.

The application also notes a payroll of $15,700 for the excavation work, with the

---

[5] The statute was revised in 2019 to include subsection (d) after the Montana
Supreme Court concluded that the previous version of the statute had been
misinterpreted for a half century.  *See State v. Running Wolf*, 457 P.3d 218, 229
(Mont. 2020) (Rice, J., concurring).  Other than Justice Jim Rice's discussion of
this statute in the *Running Wolf* case, no other court has substantively considered
this statute after the most recent revision.

[6] Scottsdale also argues Wild Horse failed to represent that it engaged in mining
work.  However, this issue does not seem to have any bearing on the Blanchards'
injuries or this dispute and is not addressed here.

sole owner of the business being the only person doing that work.  (*See* Doc. 49 at

¶ 5; *see also* Doc. 51-3 at 6.)  The parties do not dispute that these 2019

representations in the original insurance application were accurate.  (*See* Doc. 70 at

¶ 54.)  However, the parties dispute the size of Wild Horse's workforce at the time

of Blanchard's injury.

Scottsdale argues that the "Employee details report" for Wild Horse's

business demonstrates the LLC had had upwards of 15 employees by August 12,

2022, the date of Blanchard's injuries.  (*See* Doc. 51-6 at 1–3.)  While this

document does not indicate how many people were employed by Wild Horse at

any one time because only the "hire date" is listed, it shows that Wild Horse

employed more than just one person.  Further supporting Scottsdale's theory that

Wild Horse's workforce had grown substantially are the depositions of Wild Horse

employees.  In his deposition, Jason Woods said that he was employed by Wild

Horse for around two and a half years as an equipment operator.  (Doc. 51-7 at 7.)

He stated that he estimated Wild Horse had roughly 12 to 15 employees including

three "equipment operators."  (Doc. 51-7 at 8.)  And, in his deposition, Hart stated

that Wild Horse employed him.  (Doc. 51-8 at 7–8.)  While he did not know how

many employees Wild Horse had, he knew that they at least employed a human

resources-type professional.  (Doc. 51-8 at 8.)  Accordingly, the record shows that

while Wild Horse's original representation of its employment numbers may have

been accurate, as of August 2022, Wild Horse employed others in addition to
Subatch.

### 2.   Business Operations

In the same application, Wild Horse's business activities were discussed.
(*See* Doc. 51-3.)  In response to the question, "does applicant lease equipment with
or without operators," Wild Horse responded "rents daily or hourly without
operator." (Doc. 51-3 at 7.)  In another section, the application represents that
Wild Horse owned "four pieces of equipment he uses for his company Wildhorse
[sic] Trading Co, LLC but he was also renting them out with daily rates with no
operator." (Doc. 51-3 at 14.)  The application notes that "he is an escavator [sic]
and does septic and water lines." (Doc. 51-3 at 22.)  However, it is undisputed that
by August 2022, Wild Horse was employing people who were operating
equipment, an activity that the record does not reflect was represented to Scottsdale
in 2019.  Accordingly, Scottsdale was not aware that Wild Horse was renting out
equipment both with and without operators at the time it originally provided
coverage.

### B.   Misrepresentations as a Matter of Law

The representations Wild Horse made in its 2019 insurance application do
not represent the work the company was doing by August 2022.  That does not
mean they constitute a misrepresentation as a matter of law.  Defendants argue that

the period for which Wild Horse can be held accountable for any misrepresentations is when the insurance application itself was made. Scottsdale interprets Montana law differently, arguing that Wild Horse is under a continuing obligation to inform Scottsdale about its business activities and can therefore be held responsible for misrepresentations throughout the coverage period. Neither argument is completely accurate, but Defendants have the stronger one.

Defendants support their argument by relying on *Minks v. Gerttula*, an unpublished Montana Supreme Court decision concerning representations made in a lease contract. 2013 WL 2445029, *1 (Mont. June 4, 2013). There, the Montana Supreme Court held that representations made at the time of the signing of the lease were to be relied upon even when situations drastically changed during the lease period. *Id.* In turn, Scottsdale relies on *Mount Vernon Fire Insurance Co. v. Gabelhausen*, 2017 WL 2960204 (D. Mont. July 10, 2017). In *Gabelhausen*, an insurance company sued insured homeowners to determine coverage when the insured had misrepresented their ownership interest in a property in the United States Virgin Islands in their insurance application. *Id.* at *1. The Court there found that the insurance company was not on inquiry notice of the Gabelhausen's ownership interest in the property when it did not further investigate the details of that interest. *Id.* at *9.

Neither *Minks* nor *Gabelhausen* clearly instructs whether Scottsdale had the burden to seek more information from Wild Horse or Wild Horse had the burden to proactively update Scottsdale.  In this case, Wild Horse first purchased insurance from Scottsdale in 2019 and then renewed its policy in subsequent years without substantively updating Scottsdale about its business operations.  Scottsdale argues that it attempted to get more information from Wild Horse via periodic audits that were never returned but it never stopped providing coverage.  Conversely, Subatch, Wild Horse's owner, affirms that he "articulated the nature of [his] business to the insurance agent [he] procured insurance from," and that he "assumed that the insurance [he] procured would be adequate to cover claims that arose from [his] business."  (Doc. 56 at ¶ 7.)

Ultimately, both parties stuck their heads in the sand.  On the one hand, Scottsdale renewed its coverage for Wild Horse on two occasions, in 2020 and in 2021, without providing another application to inquire about the updates to Wild Horse's business.  On the other hand, Wild Horse clearly knew its business had grown in the years since it initially purchased insurance coverage, yet it never passed that information along to Scottsdale.  Nevertheless, the record does not reflect that Wild Horse ever affirmatively misrepresented its business activities.  And, Scottsdale does not demonstrate that Wild Horse's acceptance of the renewed policies, which Scottsdale chose to issue without additional information from the

insured, is a misrepresentation under § 33–15–403.  Thus, coverage is not

precluded by Wild Horse's failure to notify Scottsdale about the changes to its

business.

## IV.   Motion to Strike[7]

Defendants move to strike the Declaration of Karen Hanna, filed by

Scottsdale with its cross-motion for summary judgment as lay witness testimony.

(*See* Doc. 47.)  They argue that the declaration is an undisclosed expert disclosure

that both lacks foundation and offers improper legal conclusion as the construction

of the Policy.  They are correct.

Federal Rule of Evidence 701 allows for testimony in the form of an opinion

that is based on personal perception, is helpful, and is not based on "scientific,

technical, or other specialized knowledge within the scope of Rule 702."   Rule

702 instructs that an expert witness may testify based on their "knowledge, skill,

experience, training, or education" if they meet the Rule's strict requirements.

Karen Hanna is employed as a "Territory Director of E&S Wholesale,

Contract P&C – Mountain West" at Scottsdale and declares, in pertinent part, as

---

[7] In their Reply Brief, Defendants attempt essentially attempt to "strike" Kirse
Ledeboer's declaration regarding the Scottsdale audit.  (*See* Doc. 71 at 11–13.)
This issue has not been properly briefed and is not properly before the Court.
Thus, it is not addressed in detail here.

follows.[8]  (Doc. 49 at ¶ 2.)  She is "familiar with Scottsdale classification guidelines and program ratings for its commercial general liability insurance policies."  (Doc. 49 at ¶ 3.)  The premium Wild Horse paid for the policy under the classification for Excavation coverage "was based on a payroll of $15,700, i.e., one owner, and that owner being the only person performing excavation work."  Had Wild Horse represented to Scottsdale that it employed more people, the insurer would have charged a higher premium.  (Doc. 49 at ¶¶ 5–6.)  The "post-loading work Wild Horse was performing . . . does not come within any of the Policy's defined classes," and if Scottsdale had known about the post-loading work, it would have included the class code for "Contractors Equipment Rental Program," and charged a higher premium.  (Doc. 49 at ¶¶ 7–8.)

Hanna's testimony seeks to assert technical or specialized knowledge regarding Scottsdale's policies.  Hanna's opinions are not based on her personal experience with Wild Horse's insurance contract.  Rather they are based on her specialized knowledge taken from her experience as an insurance professional. Had Hanna been personally involved with Wild Horse's insurance policy and coverage, she may have been able to proffer some of this testimony, but her declaration does not include that detail.  Instead, she testified about what she

---

[8] Hanna's declaration does not provide any more specifics as to what the terms "E&S Wholesale" or "Contract P&C" refer.

"would have" done if the situation of the insurance contract had been different, a legal conclusion not based on her personal experience.  Her declaration is therefore stricken because it was not disclosed as expert testimony.

### CONCLUSION

Based on the foregoing,

IT IS ORDERED that Scottsdale's cross-motion for summary judgment, (Doc. 46), is DENIED and Defendants' cross-motion for summary judgment is GRANTED, (Doc. 52).  The July 8, 2024 bench trial and related deadlines are VACATED.

IT IS FURTHER ORDERED that Defendants' motion to strike, (Doc. 66), is GRANTED.

IT IS FURTHER ORDERED the Clerk is directed to enter judgment in favor of Defendants and close the case.

DATED this 28 day of June, 2024.

_____
Donald W. Molloy, District Judge
United States District Court